Peelle, J.,
delivered the opinion of the court:
This is a claim for spoliation by the Government of France on American commerce presented under the act of January ■20, 1885 (23 Stat. L., 283), known as the French spoliation .act.
*365 The ship Fame, Joseph Brown, master, an American vessel, registered at Portsmouth, N. H., August 2,1796, of 240¶| tons, and owned by Elijah Hall and John McClintock, citizens of the United States, sailed from Grenada March 8, 1797, bound for Portsmouth, laden with sugar and molasses, the property of said Hall and McClintock.
Thereafter, March 12, the vessel, while in sight of the small island south of Porto Pico known as “Dead Mans Chest,”' was chased by a brig, which soon after fired a gun to leeward,, continued the chase, again firing, and at the same time hoisted English colors, when the ship Fame hove to and was captured, by the brig, which proved to be Le Pandour, commanded by Captain Gariscan.
A prize crew was put on board and the vessel was taken to' Curasao, a Dutch island, where, on May 31,1797, both vessel and cargo were condemned by a person styling himself á “maritime agent appointed by the commission of the French Government of Santo Domingo and commissioned by the agents-, of the executive directory of the Windward Islands at Cura-pao.” The decree recites that “the present judgment shall be sent to the’ commission of the French Government at the Leeward Islands for ratification,” which, however, does not appear to have been done, though both ship and cargo were-secretly sold while the master was seeking restoration.
It is further recited in the decree that the vessel and cargo were captured’by “the French privateer Le Pandour, Captain Gariscan, commissioned by citizen Thomas, chief of division, commanding the naval forces of the French Republic at the Leeward Islands,” and that the same were condemned, for the reason that the vessel had “cleared out from Portsmouth under the vague denomination of West Indies,” contrary to “the decree of the agents of the executive directory at the Windward Islands, of date the 13th Pluviose, year 5 (February 1, 1796), which declares that every vessel arrested and being cleared under the vague denomination of West Indies shall be declared good prize.”
The vessel and cargo were neutral property lawfully on the-high seas, and were illegally captured and condemned — if condemned at all — by reason of which the vessel and cargo were *366 lost to the owners, but it is not shown that either the capture or the condemnation was the act of France.
In the trial of these spoliation cases the Government has the right to interpose the same defense that would have been available to France at the time of the seizure of the vessel, for unless France was liable for the spoliation at the time of the convention between her and the United States, concluded September 30, 1800 (Public Treaties of the United States, p. 225), it was not a claim released to France and thereby appropriated by the United States by article 2 of that treaty, which forms the basis of the claimant’s right to recover in this action.
The liability of the United States under the act of our jurisdiction follows that of France, and in this respect counsel on behalf of the defendants in his oral argument correctly said:
“This court has rested the liability of France in eveiy case upon the acts of France as a nation. Eesponsibility for any wrong done by a Frenchman to an American vessel owner has always been traced to and fixed upon France as a nation before this court has allowed a claim to be a valid diplomatic claim binding in law upon France.
“It has never been deemed sufficient by this court to prove a tort by a Frenchman, whether a private individual or an executive or judicial officer, without showing that France had -ordered the act to be done by some general or special authority and direction to commit it.”
Therefore the only question is, Was the capture or condemnation of' the vessel the act of France, or was it the act of an individual unauthorized bjr France?
The decree recites the only evidence there is before the court as to the authority for the capture, and that is that the same was by “the French privateer Le Pandour, Captain Gariscan, commissioned by citizen Thomas, chief of division, commanding the’ naval forces of the French Republic at the Leeward Islands.” It is not shown that “citizen Thomas,” though “commanding the naval forces of the French Republic at the Leeward Islands,” had any authority from the French Government to issue such commission. Nor is it shown that the commission of the French Government of Santo Domingo or the agents of the executive directory of the Windward Islands at Curasao had an3^ authority from the French Gov *367 ernment to authorize a maritime agent to act as a prize court. On the contrary, the decree shows that it was not to be put into effect until ratified by the commission of the French Government at the Leeward Islands, and even this does not appear to have been procured.
Furthermore, it appears that while the master of the vessel was treating- for the release and restoration of the property, the same was secretly sold, all of which tends to show that the capturing- vessel was acting- independently of the French Government.
At all events, it is not shown that the vessel was acting under authority of the French Government, or that the agent before whom the vessel and cargo were taken for condemnation had jurisdiction even to the extent he assumed to act, and for that reason we must hold that no valid claim to indemnity upon the French Government arose by reason of such acts, and hence no liability exists against the United States, and for that reason the claimants are not entitled to recover.
Had the condemnation proceedings taken place before a con-' sul or other judicial officer authorized by France to hold prize courts, the recital in the decree that the capture was made by a French privateer would be sufficient to bind France; or, though the capture was made by an unauthorized vessel, yet had the property so captured been condemned by a legally constituted French prize court, and thereby lost to the owners, we think France would have been liable therefor.
As to the cases of the Nancy, Perry, master; the Two Sisters, Sherrer, master, and the Hope, Bright, master, referred to by counsel on both sides, we have only this to say: Neither of those cases has yet been tried, and the Nancy, Peny, master, appears to be the only one ready for trial.
We find no papers in either of those cases contradictory to the statements in the decree in this case as to the sources of the captor’s authority in the premises, or to the authority of the agent before whom the condemnation proceedings were had, nor does it appear that the captor in either of those cases had any different authority for the captures than in the pres • ent case.
True, the list of 286 privateers making captures, of which Le Pandour is one, mentioned in the reports of the delibera *368 tions of the “executive directory at the Cape,” cited by the claimants, does not tend to show that Le Pandour was recognized by said commission as a duly authorized privateer. She may, as the defendants contend, have been placed on that list as a privateer by reason of the capture by her of the Hope, Bright, master, wherein a condemnation of the captured vessel was had at Cape Franpois on copies of the papers sent by a justice of the peace from Jacmel.
But it is not shown that the list was either made out or certified to by authority of the French Government as a list of vessels commissioned by it to act as privateers.
Furthermore, the condemnation proceedings were had in Dutch territory, not before a French consul authorized bjr the central government to adjudge prize cases, but before one styling himself an agent, responsible, if at all, to colonial offi'cers. Hence the liability, if any ever existed, was against the Netherlands; for, if France was not liable as a nation for the acts of the captor or the officer before whom the condemnation proceedings were had, then France was not even a joint tortfeasor.
By article 5 of the convention between the United States and the United Netherlands, concluded at The Hague October 8, 1782 (Public Treaties of the United States, pp. 533, 534), it was provided that the respective Governments “shall endeavor, by all means in their power, to defend and protect all vessels and their effects belonging to their subjects and inhabitants, respectively, or to any of them, in their ports, roads, havens, internal seas, passes, rivers, and, as far as their jurisdiction extends at.sea, to recover and cause to be restored to the true proprietors, their agents, or attorneys, all such vessels and effects which shall be taken undei their jurisdiction.”
Under that provision of the treaty, when a vessel belonging to a citizen of the United States was captured by a French .privateer or by a pirate and taken within the jurisdiction of the Netherlands and condemned by a French consul or other French officer, whereby the property was lost to the owner, a diplomatic claim thereby arose against the Fetherlands for compensation; and if the capture and condemnation were not authorized by France, then the Netherlands were alone responsible under the treaty.
*369 Such claims were asserted by the United States against the Netherlands at the time they arose, and- they were made the subject-matter of correspondence between the two Governments, but were never pressed to a conclusion, as those against France and Spain were. Still, the principle involved is the same.
The conclusion of the court is that the claims in suit were not claims to indemnity upon the French Government at the time of the treaty of September 30, 1880, but that if any liability has been shown it is the liability of the Netherlands.
It is ordered that the findings and conclusions herein, together with this opinion, be certified to Congress for “final action.”